This opinion is uncorrected and subject to revision before
publication in the New York Reports.
------------------------------------------------------------------

No. 1
Mary Finerty &c.,
            Respondents,
        v.
Abex Corporation, Formerly Known
as American Brake Shoe Company,
et al.,
            Defendants,
Ford Motor Company,
            Appellant.
(And Another Action.)


        Anton Metlitsky, for appellant.
        James M. Kramer, for respondents.
        Chamber of Commerce of the United States of America,
amicus curiae.


PIGOTT, J.:

        Plaintiff claims that he was exposed to asbestos during

the 1970s and 1980s while replacing asbestos-containing brakes,

clutches and engine parts on Ford tractors and passenger vehicles

in Ireland.  In 1985, plaintiff emigrated to Queens, New York,

- 1 -

and, years later, was diagnosed with peritoneal mesothelioma.

In 2010, plaintiff and his wife commenced this action against, among others, Ford Motor Company ("Ford USA"), Ford Motor Company, Ltd. ("Ford UK") and Henry Ford & Son, Ltd. ("Ford Ireland")[1] alleging strict products liability under the theories of defective design and failure to warn.  After discovery, Ford USA moved for summary judgment seeking to dismiss the complaint on the ground that Ford USA did not manufacture, produce, distribute or sell the parts in question, pointing out that they were manufactured, produced, distributed and sold by its wholly-owned subsidiary, Ford UK.  Ford USA further moved to dismiss the complaint pursuant to CPLR 3211 (a) (7) arguing that the complaint should be dismissed for failure to state a cause of action because it was devoid of any allegations supporting a claim that the court should "pierce the corporate veil" such that Ford USA could be held derivatively liable for the acts of Ford UK.

Plaintiff countered that Ford USA was "actively involved" in the design, specification, production and sale of Ford products throughout the world, including the United Kingdom, such that it could be held liable for the role it "independently played" in placing the products into the stream of commerce and in failing to warn plaintiff.

_____

[1] In September 2014, plaintiff consented to the dismissal of the complaint against Ford Ireland for lack of personal jurisdiction.

Supreme Court, while holding that there was no basis upon which to pierce the corporate veil, nonetheless determined that because plaintiff produced evidence showing that Ford USA "exercised significant control over Ford [UK] and Ford Ireland and had a direct role in placing the asbestos-containing products to which [plaintiff] was exposed into the stream of commerce," there was a question of fact concerning Ford USA's "direct responsibility for plaintiff's injuries . . . ."

The Appellate Division affirmed the order of Supreme Court denying Ford USA's motion for summary judgment (125 AD3d 564 [1st Dept 2015]).[2]  It agreed with Supreme Court that there was "no basis for piercing the corporate veil" but held that "the record demonstrate[d] that Ford USA acted as the global guardian of the Ford brand, having a substantial role in the design, development, and use of the auto parts distributed by Ford UK, with the apparent goal of the complete standardization of all products worldwide that carried the signature Ford logo" (id. at 565).  As such, the Appellate Division held that there were factual issues concerning whether Ford USA could be found "directly liable as a result of its role in facilitating the distribution of the asbestos-containing auto parts on the ground

---

[2] The Appellate Division also reversed a separate order of Supreme Court that had denied Ford UK's motion to dismiss the complaint for lack of personal jurisdiction (125 AD3d 564, 565 [1st Dept 2015]).  Plaintiff has not appealed from that portion of the Appellate Division order.

that it was 'in the best position to exert pressure for the improved safety of products' or to warn end users of these auto parts of the hazards they presented" (id., quoting Godoy v Abamaster of Miami, 302 AD2d 57, 60-61 [2d Dept 2003], lv dismissed 100 NY2d 614 [2003]).

The Appellate Division granted Ford USA leave to appeal to this Court pursuant to CPLR 5713, and certified the question of whether that portion of the order that affirmed the order of Supreme Court was properly made.  We hold that it was not, and answer the certified question in the negative.

It is well settled that a manufacturer of defective products who places them into the stream of commerce may be held strictly liable for injuries caused by their products, regardless of privity, foreseeability or due care (see Sukljian v Charles Ross & Son Co., Inc., 69 NY2d 89, 94 [1986]; Codling v Paglia, 32 NY2d 330, 342 [1973]; see also Amatulli v Delhi Constr. Corp., 77 NY2d 525, 532 [1991]).  It is the manufacturer, and the manufacturer alone, "who can fairly be said to know and to understand when an article is suitably designed and safely made for its intended purpose" and who "has the practical opportunity, as well as a considerable incentive, to turn out useful, attractive, but safe products" (Codling, 32 NY2d at 340-341).

Strict liability may also be imposed on retailers and distributors of allegedly defective products because such sellers, due to their continuing relationship with the

manufacturers, are usually "in a position to exert pressure for the improved safety of products and can recover increased costs within their commercial dealings, or through contribution or indemnification in litigation . . ." (Sukljian, 69 NY2d at 95). Sellers who engage in product sales in the ordinary course of their business are subject to strict liability because they "may be said to have assumed a special responsibility to the public, which has come to expect them to stand behind their goods" (id.; see Restatement [Second] of Torts §402A, Comment c).

Plaintiff asserts that he raised a question of fact concerning Ford USA's role in the "chain of distribution" by submitting evidence establishing that Ford USA played a "direct role" in the design, distribution and marketing of asbestos-containing parts by "imposing" its decisions in those areas on Ford UK.  The record evidence demonstrates, however, that it was Ford UK, not Ford USA, that manufactured and distributed the tractor and vehicle parts.

Ford USA was not a party within the distribution chain, nor can it be said that it actually placed the parts into the stream of commerce.  Although plaintiff submitted evidence tending to show that Ford USA provided guidance to Ford UK in the design of certain tractor components, absent any evidence that Ford USA was in fact a manufacturer or seller of those components, Ford USA may not be held liable under a strict products liability theory (cf. Sage v Fairchild-Swearingen Corp.,

70 NY2d 579, 586-587 [1987] [designer of defective hanger was also the manufacturer]).  Moreover, absent any indication that Ford USA was in the distribution chain, it is of no moment that Ford USA exercised control over its trademark (see Laurin Maritime AB v Imperial Chem. Indus. PLC, 301 AD2d 367, 367-368 [1st Dept 2003], lv denied 100 NY2d 501 [2003]; Porter v LSB Indus., Inc., 192 AD2d 205, 211 [4th Dept 1993]).  In any event, the record indicates that Ford USA's "world-wide" trademark program described how the trademark was to be used on packaging of Ford products, and did not contain directives as to what warnings, if any, were required to be placed on the packaging itself.

The Appellate Division did not determine that there was a factual question as to whether Ford USA was the manufacturer, retailer or distributor of the asbestos-containing parts. Rather, the Appellate Division hinged Ford USA's potential liability on the premise that there was evidence that Ford USA played "a substantial role in the design, development, and use of the auto parts distributed by Ford UK," such that Ford USA's "role in facilitating the distribution of the asbestos-containing auto parts" could subject it to strict liability because it was in the best position to exert pressure on Ford UK and to warn end users of the hazards presented by the auto parts (125 AD3d at 565 [emphases supplied]).  That was error.

Ford USA, as the parent corporation of Ford UK, may not

be held derivatively liable to plaintiff under a theory of strict products liability unless Ford USA disregarded the separate identity of Ford UK and involved itself directly in that entity's affairs such that the corporate veil could be pieced (see Billy v Consolidated Mach. Tool Corp., 51 NY2d 152, 163 [1980]), a conclusion that neither Supreme Court nor the Appellate Division reached in this instance.[3]

It was also error for the Appellate Division to conclude that Ford USA could be subject to strict liability because it was in the "best position" to "exert pressure" on Ford UK for improved product safety.  Of course, as Ford UK's parent company, Ford USA could "exert pressure" on Ford UK, but we have never applied that concept to a parent company's presumed authority over a wholly-owned subsidiary.  We have, however, routinely applied that concept to sellers of a manufacturer's products, because it is the sellers who, through their ongoing relationship with the manufacturers and through contribution and indemnification in litigation, combined with their role in placing the product in the consumer's hands, are in the best position to pressure the manufacturers to create safer products (see Sukljian, 69 NY2d at 95; see also Jaramillo v Weyerhaeuser Co., 12 NY3d 181, 192 [2009] [refusing to hold seller of used equipment liable for strict products liability because there was

_____

[3] Nor has plaintiff argued that Ford USA and Ford UK had a principal/agent relationship.

no reason to think that imposition of such liability "would create any measurable 'pressure for the improved safety of products' on . . . manufacturers"]; Godoy, 302 AD2d at 63 [holding that seller could obtain indemnification from distributor that was higher in the distribution chain because the distributor was "closer to the manufacturer" and was in a better position to "exert pressure" on the manufacturer]; Nutting v Ford Motor Co., 180 AD2d 122, 129 [3d Dept 1992] [seller of fleet of vehicles was in position to use its leverage against manufacturer that could be used to encourage the manufacturer to make safer vehicles]).

Accordingly, the order of the Appellate Division insofar as appealed from should be reversed, with costs, Ford USA's motion for summary judgment dismissing the complaint against it granted and the certified question answered in the negative.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order insofar as appealed from reversed, with costs, defendant Ford Motor Company's motion for summary judgment dismissing the complaint against it granted and certified question answered in the negative. Opinion by Judge Pigott. Chief Judge DiFiore and Judges Abdus-Salaam, Stein, Fahey and Garcia concur. Judge Rivera took no part.

Decided May 3, 2016