# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 36
In the Matter of the Eighth Judicial District
Asbestos Litigation.

Donald J. Terwilliger, &c.,
  Appellant,
  v.
Beazer East, Inc., &c., et al.,
  Defendants,
Honeywell International, Inc., &c.,
  Respondent.

John N. Lipsitz, for appellant.
Victoria A. Graffeo, for respondent.
Builders Exchange, Inc., et al., amicus curiae.

FEINMAN, J.:

Plaintiff Donald J. Terwilliger, as administrator of the estate of decedent Donald R.

Terwilliger, brought this negligence and products liability action against defendant

- 1 -

Honeywell, as successor-in-interest to the Wilputte Coke Oven Division of the Allied Chemical Corporation ("Wilputte"), seeking damages for injuries decedent sustained while employed by Bethlehem Steel ("Bethlehem") at its plant in Lackawanna, New York (the "Lackawanna plant"). The question presented on this appeal is whether defendant has met its burden on summary judgment that the large, industrial coke ovens located in decedent's workplace are not "products" for purposes of strict products liability, such that defendant did not owe a duty to warn of their harmful nature. We hold that defendant failed to carry that burden and, therefore, the order of the Appellate Division should be reversed.

I

According to the complaint, decedent worked for Bethlehem as a coke oven "lid man" at the Lackawanna plant between 1966 and 1993. A "coke oven," roughly 13 feet high and 1.5 feet wide, burns coal at high temperatures to create coke, a fuel then used in the production of steel. A "coke oven battery" is a collection of these individual ovens stacked in a long row to create the wall of the battery structure in which the ovens are housed. The batteries at issue here were located on the grounds of the coke oven plant, which "consisted of a number of other structures, including coal towers, coal conveyors, coke wharfs, screening stations, storage tanks, electrical substations, gas recovery systems, byproduct facilities, and quenching stations."

Decedent's job as a lid man was to work on top of the battery, near where the ovens released the emissions that are a byproduct of the coke production process. Plaintiff alleges that prolonged exposure to these emissions poses long-term health risks, most notably

various types of cancer. The complaint further alleges that from 1966, the time he began working around the ovens until the late 1970s, when OSHA set forth regulations requiring warning placards to be placed on the ovens and all oven workers to wear protective respirators, decedent was continuously and "injuriously exposed to coke oven emissions from coke ovens designed, constructed, maintained and repaired" by Wilputte.

Decedent died from lung cancer in 2012. The following year, his estate commenced this action, alleging, inter alia, that decedent's cancer was proximately caused, in part, by his exposure to the coke oven emissions at the Lackawanna plant. Defendant does not dispute this for the purposes of this appeal. This appeal pertains only to plaintiff's second and fourth causes of action, which essentially allege under a products liability theory that defendant Honeywell, as successor-interest to Wilputte, at all times relevant "engaged in the design, construction, maintenance, and repair of coke ovens and coke oven batteries, as well as in the sale of goods and contracting services for the construction of coke ovens" at the Lackawanna plant[1] and "failed to disclose to plaintiff's decedent and those similarly situated or warn them of the known dangers associated with the inhalation of coke emissions."

Defendant moved for summary judgment, arguing first "that the coke ovens at issue are not products and hence, do not subject [it] to strict liability as a products manufacturer";

---

[1] Although the original contract between Wilputte and Bethlehem was not produced in discovery, the record contains another contract between Wilputte and U.S. Steel for the construction of coke ovens which both parties agree is an approximate facsimile of the agreement likely entered into by Wilputte and Bethlehem.

and second "that Wilputte's contract with Bethlehem, under which it designed and built the ovens[,] was one for services, and that, as a service provider it is not subject to strict products liability." In response, plaintiff submitted several documents relevant to the nature of Wilputte's business, including sales records showing that Wilputte had, by 1962, sold hundreds of coke ovens in the United States, Canada, and Mexico; Wilputte's proprietary schematics for the coke oven batteries and their various component parts; and a 1954 advertising brochure widely distributed by Wilputte entitled "The Wilputte Coke Oven," that contains several figures detailing the various components that make up ovens like the ones at issue. Plaintiff averred that "[t]he individual coke ovens, assembled into battery units, were products with a particular design, the purpose of which was to transform coal into coke for the steel industry."

Supreme Court, among other things, denied defendant's motion, framing its conclusion as follows:

> "taking into consideration: that defendant marketed and sold different types of coke ovens throughout the United States and in Mexico and Canada; that the customer could select the number of ovens it purchased to create a battery (some purchases were as small as 15 coke ovens); that defendant published a brochure for its coke ovens explaining their different types of ovens and providing a detailed explanation of the parts of the oven; and that each oven had its own equipment including gas jets, standpipe, activation system and mechanical doors, it is this court's conclusion that the coke ovens are more like machines or equipment than a building"

(2016 WL 4077169, *4 [Sup Ct, Erie County Mar 7, 2016]). In essence, the oven's "function and purpose" outweighed considerations of its size and its integration into the battery structure. Supreme Court also highlighted the "sound social policy" underlying this

Court's strict products liability jurisprudence and concluded that defendant, as the manufacturer of the ovens, "was in the best position to assess if the coke ovens it was marketing were safely made and suitable for their intended purpose" (id. at *5).

The Appellate Division reversed and granted the motion for summary judgment dismissing the complaint against Honeywell (150 AD3d 1617 [4th Dept 2017]). Noting that the battery's construction "would have taken approximately 1,460,000 hours of labor to complete over six phases," the Appellate Division opined "that service predominated the transaction herein and that it was a contract for the rendition of services, i.e., a work, labor and materials contract, rather than a contract for the sale of a product" (id. at 1619). Therefore, emphasizing its size and immovable nature, the court concluded that "a coke oven, installed as part of the construction of the 'great complex of masonry structures' at Bethlehem, permanently affixed to the real property within a coke battery, does not constitute a 'product' for purposes of plaintiff's products liability causes of action" (id., quoting Matter of City of Lackawanna v State Bd. of Equalization and Assessment of State of N.Y., 16 NY2d 222, 227 [1965]).

We granted plaintiff leave to appeal (30 NY3d 912 [2018]) and now reverse.

II

In New York, a product is considered "defective," and the manufacturer liable, if the product: (1) "contains a manufacturing flaw," (2) "is defectively designed," or (3) "is not accompanied by adequate warnings for the use of the product" (Liriano v Hobart Corp., 92 NY2d 232, 237 [1998]). Here, defendant primarily argued on summary judgment that

the coke ovens at issue are not "products" to which a duty to warn can attach. Thus, although many of the principles underlying these three categories overlap, our analysis is specific to the "failure-to-warn" category of claims.

Initially, we note that when considering whether strict products liability attaches, the question of whether something is a product is often assumed; none of our strict products liability case law provides a clear definition of a "product." However, "[a]part from statutes that define 'product' for purposes of determining products liability, in every instance it is for the court to determine as a matter of law whether something is, or is not, a product" (Restatement [Third] of Torts, Products Liability § 19, Comment a [1998]).

In the failure-to-warn context, we have imposed a duty upon a manufacturer whose wares serve a standardized purpose, such that the product's latent dangers, if any, are known, or should be known, from the time it leaves the manufacturer's hands. In many cases, industrial machines have been assumed to be products for strict liability purposes (see e.g. Passante v Agway Consumer Prods., Inc., 12 NY3d 372 [2009] [mechanical dock leveler]; Liriano, 92 NY2d at 232 [commercial meat grinder]; Robinson v Reed-Prentice Div. of Package Mach. Co., 49 NY2d 471 [1980] [industrial plastic molding machines]). However, what constitutes a product is not limited to the physical characteristics common to such machines (see e.g. Matter of New York City Asbestos Litig. (Dummitt), 27 NY3d 765, 787 [2016] [valves requiring asbestos-laden gaskets]; McLaughlin v Mine Safety Appliances Co., 11 NY2d 62, 68 [1962] [medical heating blocks]; Rosebrock v General Elec. Co., 236 NY 227 [1923] [wooden packing materials for electric transformers]).

Because many products in this context can create "circumstances where the danger from use was likely to be so very disastrous," our case law has not focused on creating an exhaustive list of the product's physical characteristics but has instead focused on those potential dangers (Rosebrock, 236 NY at 238).

Intertwined with our analysis of whether something is a product is the more central question of whether the defendant manufacturer owes a duty to warn (see Dummitt, 27 NY3d at 787, citing Darby v Compagnie Natl. Air France, 96 NY2d 343, 347 [1984]; cf. Restatement [Third] of Torts, Products Liability § 19, Comment a [1998] [internal citation omitted] ["Given that design and warning cases turn on essentially risk-utility evaluations, the practical importance of whether something is, or is not, a product has diminished somewhat"]). Although "the existence and scope . . . of a duty [to warn] are generally fact-specific" (Liriano, 92 NY2d at 240), a manufacturer's duty typically "extends to the original or ultimate purchasers of the product, to employees of those purchasers, and to third persons exposed to a foreseeable and unreasonable risk of harm by the failure to warn" (McLaughlin, 11 NY2d at 68 [citations omitted]). Thus, a manufacturer can be held liable for failing to warn of "latent dangers resulting from foreseeable uses of its product of which it knew or should have known" (id., citing Rastelli v Goodyear Tire & Rubber Co., 79 NY2d 289, 297 [1992]), as well as "the danger[s] of unintended uses of a product provided these uses are reasonably foreseeable" (Lugo v LJN Toys, 75 NY2d 850 [1990]).

Failure-to-warn claims, like all strict products liability claims, sound in tort rather than contract; the defendant manufacturer's liability will "ar[i]se out of the nature of [its]

business and the danger to others incident to its mismanagement," even where no privity exists between the maker of the hazardous article and its end-user (Thomas v Winchester, 6 NY 397, 410 [1852]; see also Denny v Ford Motor Co., 87 NY2d 248, 256 [1995] [recognizing the establishment of strict products liability as a "tort remedy"]). Although failure-to-warn claims "can be framed in terms of strict liability or negligence, [such] claims grounded in strict liability and negligence are functionally equivalent, as both forms of a failure-to-warn claim depend on the principles of reasonableness and public policy at the heart of any traditional negligence action" (Dummitt, 27 NY3d at 787).

Thus, on this motion for summary judgment, we evaluate whether the coke ovens are products within the broader context of our common-law principles of assigning a legal duty to warn.  As we most recently explained in Dummitt, the court's overarching concern in assigning a duty to warn is to

> "settle upon the most reasonable allocation of risks, burdens and costs among the parties and within society, accounting for the economic impact of a duty, pertinent scientific information, the relationship between the parties, the identity of the person or entity best positioned to avoid the harm in question, the public policy served by the presence or absence of a duty and the logical basis of a duty" (id. at 788 [citations omitted]).

To that end, although the criteria for determining whether a duty should attach to a seller may be tied to the nature of the given transaction, our case law emphasizes governing factors such as a defendant's control over the design of the product, its standardization, and its superior ability to know—and warn about—the dangers inherent in the product's reasonably foreseeable uses or misuses (see Dummitt, 27 NY3d at 793, 800-801).

III

A

We must determine, in light of the foregoing principles, whether the record before us supports defendant's arguments on summary judgment that the ovens are not products to which strict liability can attach under a failure-to-warn theory. We review defendant's motion for whether it has "ma[d]e a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). On a motion for summary judgment, the "facts must be viewed in the light most favorable to the non-moving party" (Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]), "and every available inference must be drawn in the [non-moving party's] favor" (De Lourdes Torres v Jones, 26 NY3d 742, 763 [2016]). If the moving party meets this burden, "the burden then shifts to the non-moving party to 'establish the existence of material issues of fact which require a trial of the action'" (Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 833 [2014], quoting Vega, 18 NY3d at 503).

Based on this record, defendant has not met its burden in showing that the coke ovens at issue are not products as a matter of law. Regardless of the alterations Bethlehem may have made to the scale and specifications of the battery at large, the ovens themselves served one function: the production of coke. This process was standard across all variations of coke ovens that Wilputte sold, ultimately placing the hazardous thing at issue squarely within the category of products to which liability has attached in the failure-to-warn context.

Furthermore, we conclude that Wilputte has not carried its burden as, on this record of undisputed facts, it was an expert designer and manufacturer in the market and sale of these coke ovens such that a duty to warn was owed. First, it is undisputed that Wilputte exerted full control over the manner in which the coke ovens were built. Wilputte served far more than an advisory role in the building of the coke ovens; based on the contract between Wilputte and U.S. Steel furnished in discovery, Wilputte was responsible for furnishing most if not all necessary materials in the production of the ovens, including the various parts and components of the operative machines specific to Wilputte's proprietary design schematics. Although Bethlehem made specific requests to suit the Lackawanna plant's needs, the coke oven designs—as evidenced in Wilputte's advertising brochures and technical drawings—were complex and unique to Wilputte's enterprise, and Wilputte was responsible for installing the ovens pursuant to those designs. Nothing in the record implies that Bethlehem could have created these ovens without Wilputte's standard design and control over its product, nor could Bethlehem have altered the ovens' hazardous nature.

Second, the record reveals that Wilputte was responsible for placing the ovens into the stream of commerce and that it derived financial benefit from its role in the production process. Indeed, by the time decedent began working for Bethlehem, Wilputte had sold hundreds of coke ovens to plants both in the United States and in Canada and Mexico. Wilputte also marketed its ovens with informational brochures showing the completed ovens and their functionality, indicating that Wilputte, not Bethlehem, was the commercial

source of the product.[2] Although the ovens were largely assembled and completed on-site, that merely speaks to the logistical realties of the market of which Wilputte had a considerable share. Putting aside the dissent's insistence that products be produced and marketed on a "mass" scale (dissenting op at 8-10)—a requirement we have never held as a prerequisite for liability to attach[3]—the record leaves no doubt that Wilputte was the sole distributor of its ovens and that its business in this context was that of a manufacturer.

Finally, the record supports Supreme Court's conclusion that Wilputte was in the best position to assess the safety of the coke ovens because of its superior knowledge regarding the ovens' intended functionality (see 2016 WL 4077169, at *5). "A major determinant of the existence of a duty to warn" is an assessment of "whether the manufacturer is in a superior position to know of and warn against those hazards" inherent to its product (Dummitt, 27 NY3d at 790). As this Court has recognized, "the product in the hands of the consumer is often a most sophisticated and even mysterious article"

---

[2] The dissent downplays the significance of the 1954 brochure by focusing on its cover page, which describes Wilputte as a "designer[] and builder[]" of coke ovens, while ignoring the larger intended purpose of the entire brochure: the marketing and sale of coke ovens (dissenting op at 10 n 2). Whatever label Wilputte gave itself as the conveyor of those ovens is based in marketing semantics rather than the "nature of [its] business" as manufacturer (Winchester, 6 NY at 410), which plaintiff has ably established through its submissions opposing summary judgment.

[3] In fact, in Sprung v MTR Ravensburg, we concluded that even manufacturers of one-of-a-kind products can be held liable when they "hold themselves out as having expertise in manufacturing their custom products, have the opportunity and incentive to ensure safety in the process of making those products, and are better able to shoulder the costs of injuries caused by defective products than injured consumers or users" (99 NY2d 468, 474 [2003]).

(Codling v Paglia, 32 NY2d 330, 340 [1973]). Thus, our jurisprudence has held manufacturers liable because "it is often only the manufacturer who can fairly be said to know and to understand when an article is suitably designed and safely made for its intended purpose" and because the manufacturer "has the practical opportunity, as well as considerable incentive, to turn out useful, attractive, but safe products" (id. at 340-341).

Here, the record shows that Wilputte was the expert in the production of coke ovens and coke oven batteries. For example, the technical drawings included in the record, which were solely the intellectual property of Wilputte, reveal that it was wholly responsible for the initial design of the individual ovens that were then advertised in its marketing brochures. The brochures, technical designs, and defendant's established market share clearly demonstrate that Wilputte "c[ould] fairly be said to know and to understand when an article is suitably designed and safely made for its intended purpose," giving it the "opportunity and incentive" to make the ovens safe for its users at the time they were sold and built (Codling, 32 NY2d at 340; cf. Micallef v Miehle Co., Div. of Miehle-Goss Dexter, 39 NY2d 376 [1976] [considering whether a manufacturer "kept abreast of recent scientific developments and the extent to which any tests were conducted to ascertain the dangers of the product" as part of the manufacturer's "legal responsibility"] [internal citations omitted]). By the same token, there is no evidence in this record to suggest that decedent or Bethlehem was better-positioned to understand the dangers inherent to the coke ovens or decedent's role as a lid man at the Lackawanna plant.

B

Defendant's arguments that the coke ovens are not products as a matter of law, and that it did not owe a duty to warn, are unpersuasive. First, defendant insists that the allegation that it failed to "warn of the dangers of use or exposure to their operative coke ovens" is insufficient to sustain a valid failure-to-warn claim because it does not identify a specific component or part of the ovens as "defective." Yet failure-to-warn claims are premised not on a physical defect in a product's constituent parts, but rather the "dangers resulting from foreseeable uses of [the] product of which [the manufacturer] knew or should have known" (Liriano, 92 NY2d at 240). Thus, the plaintiff need not identify a specific defective component because the "defect" in these cases lies in the failure to warn of the whole product's dangerous "intended use or a reasonably foreseeable unintended use" (Lugo, 75 NY2d at 852; see also Rastelli, 79 NY2d at 297; McLaughlin, 11 NY2d at 68). No more specificity is required to maintain a prima facie failure-to-warn claim, and defendant's arguments to the contrary fundamentally misunderstand our failure-to-warn case law.[4]

---

[4] Similarly, the dissent relies on the affidavits of defendant's experts—which, inter alia, assert that the coke ovens are merely "brick chamber[s]" that "cannot function on their own" outside the larger battery—to conclude that defendant submitted "uncontested proof" that the coke ovens "cannot reasonably be viewed as separate and distinct from the larger coke battery" (dissenting op at 10). Yet the brochure submitted by plaintiff plainly describes, through various diagrams, two different kinds of "coke ovens" that include among their constituent parts the (presumably brick) "oven chambers." The brochure makes no mention of the battery that defendant and the dissent now claim are inseparable from "operable coke ovens," which are the marketed product that plaintiff has always asserted underlies his claim. Supreme Court's determination that "there is a distinction between the coke manufacturing plant, the coke oven battery and the coke oven" therefore

Relatedly, defendant argues that our analysis should turn on a bright-line distinction between products and buildings, claiming that the two are mutually exclusive for purposes of strict products liability. Defendant contends that because these ovens are built into the large structures that make up the oven battery, they cannot be products as a matter of law. The Appellate Division agreed, citing City of Lackawanna for the conclusion that fixtures on real property taxable as such cannot be products to which strict liability attaches.

City of Lackawanna is unsuitable to our inquiry here. In that case, we held that the same coke ovens now at issue did not fall within an exemption from Real Property Tax Law § 12 (f) for "movable machinery or equipment consisting of structures or erections to the operation of which machinery is essential." Recognizing that the ovens were "[q]uite obviously" a "great complex of masonry structures, erections and equipment," we concluded that "by common-law standards, these structures would be deemed real property" (16 NY2d at 227).

Our decision in City of Lackawanna was solely limited to the Real Property Tax Law. Further, the fact that something is taxable as real property does not render it outside the realm of strict liability. In fact, other affixed taxable real property under the Real Property Tax Law, such as elevators and large turbines, have nevertheless been subject to strict products liability claims, a point defendant does not refute (see Real Property Tax Law § 12 [f]; Di Marco v Westinghouse Elec. Corp., 170 AD2d 760 [3d Dept 1991];

_____

is well-supported on this record, and clearly contradicts the dissent's assertion that coke oven batteries, or other "single-use facilities," could be construed as products under our analysis (see id. at 14).

Potaczala v Fitzsimmons, 171 AD2d 1015 [4th Dept 1991]). Even the Restatement, in

cautioning against the inclusion of structures under the products liability umbrella,

acknowledges that items beyond "tangible personal property distributed commercially for

use or consumption . . . such as real property and electricity, are products when the context

of their distribution and use is sufficiently analogous to the distribution and use of tangible

personal property" (Restatement [Third] of Torts, Products Liability § 19 [a] [1998]

[emphasis added]). Thus, defendant's emphasis on the ovens' size and immobility is

irrelevant to the question of whether they are products for purposes of establishing a duty

to warn.

       We similarly reject defendant's arguments and the Appellate Division's conclusion

that the contract between Bethlehem and Wilputte precludes liability in this case. The

Appellate Division, citing Perlmutter v Beth David Hospital, based its conclusion that the

ovens built by defendant were not "products" in part on the rationale that "service

predominated the transaction herein" (150 AD3d at 1619, citing 308 NY 100, 104 [1954]).

Our decision in Perlmutter applied the sales-service distinction to the unique transactional

circumstances of a hospital visit and did not extend that test beyond the implied warranty

claim at issue. On occasion, this test has been utilized when determining whether strict

products liability applies to a hybrid sales-service contract given the overlapping policy

considerations inherent to both our implied warranty and strict liability jurisprudence (see

e.g. Trustees of Columbia Univ. v Gwathmey Siegel & Assoc., 192 AD2d 151, 155 [1st

Dept 1993]; Hart v Moray Homes, 158 AD2d 890, 892 [3d Dept 1990]; Van Iderstine v

Lane Pipe Corp., 89 AD2d 459, 463 [4th Dept 1982]).  Indeed, where the predicate sale of a good is wholly absent because the transaction was "clearly one for services" (Perlmutter, 308 NY at 104), we agree that strict products liability does not apply.

Where, however, a good is sold in the course of a transaction, the mere presence of a service component in that transaction does not mean that the furnished item is not a product to which a duty to warn may apply. As we explained in Milau Assoc v North Ave Dev. Corp., "particularly in cases involving personal injury, the absence of an enforceable contractual relationship for the technical sale of goods will not necessarily result in the foreclosure of all remedies, at least where the policies favoring the imposition of strict tort liability for the marketing of defective products are present" (42 NY2d 482, 488-489 [1977] [emphasis added]; see also Perazone v Sears, Roebuck & Co., 128 AD2d 15, 20-21 [3d Dept 1987] [explaining that the "focus" of breach of warranty claims "is on the transaction between the seller and the particular buyer involved," while "(a) strict products liability cause of action . . . had been extended to retailers for policy reasons," even where the transaction is "primarily service oriented"]). While we in no way today extend strict products liability to general contractors who agree by the nature of their business to provide a construction service, even defendant concedes that "a builder may be held liable for providing or selling a product in connection with construction services."

Here, it is therefore of no moment that the coke ovens at issue took many hours to build, or that the work required to complete the transaction between Bethlehem and Wilputte resembled tasks typically fulfilled by a general contractor. Simply put, the

Appellate Division's emphasis on the apportionment of time between sale and service is not the test upon which defendant's duty relies. Such a test ignores the inescapable fact that Wilputte crafted, marketed, and sold the coke ovens that allegedly caused the harm underlying plaintiff's strict product liability claim.

IV

Given the procedural posture in which this case comes to us—on defendant's motion for summary judgment—we need only conclude that the coke ovens at issue are sufficiently the type of products common to our prior cases to resolve this appeal. Additionally, the imposition of a duty to warn in this case is a "reasonable allocation of risks, burdens and costs among the parties and within society" (Dummitt, 27 NY3d at 788). Establishing a legal duty in a strict products liability case is an inherently fact-sensitive inquiry (see Liriano, 92 NY2d at 237). In reversing the order below, we do not, as the dissent argues, purport to extend strict liability to general contractors who may be involved in the construction of buildings where defective products are housed. We merely adhere to our tradition of evaluating such claims on a case-by-case basis and conclude that defendant has failed to meet its burden of establishing on this record that the article at issue is not a product.

Accordingly, the order of the Appellate Division should be reversed, with costs, and defendant Honeywell's motion for summary judgment dismissing the complaint against it denied.

Matter of Eighth Judicial District Asbestos Litigation
(Terwilliger &c. v Beazer East, Inc., et al.)

No. 36

STEIN, J. (dissenting):

The majority holds that a coke oven—a large brick chamber that is capable of

holding more than 25 tons of coal at one time and is entirely indivisible, both structurally

- 1 -

and functionally, from the 10-story tall "battery" that houses it—is a product. Because this Court's products liability jurisprudence does not support this result, I respectfully dissent.

In this negligence and strict products liability action, plaintiff seeks to recover for injuries sustained by decedent, Donald R. Terwilliger, caused by exposure to "emissions from coke ovens designed, constructed, maintained and repaired by," among other companies, defendant Honeywell International, Inc., successor in interest to the Wilputte Coke Oven Division of Allied Chemical Corp. According to plaintiff, these emissions were known carcinogens and, "as manufacturers, installers and maintainers of coke ovens," Wilputte "knew, or should have known of the hazards or dangers that resulted from the design and operation of their coke ovens." Thus, plaintiff averred that Wilputte was negligent in its failure to warn decedent "of the severe hazards inherent in the use or exposure to [its] operative coke ovens."

In its motion for summary judgment dismissing the complaint as against it, Honeywell argued, among other things, that Wilputte's coke ovens were not products and, thus, could not expose Honeywell to products liability. In support of their position, Honeywell proffered the affidavit of John Balik, which is largely disregarded by the majority. Balik—an engineer with more than 30 years of experience "in all phases of coke oven battery construction including estimating, purchasing, engineering, accounting, cost control, project management, project engineering and supervision of direct hire craftsmen and subcontractors on projects"—described a coke oven battery as "a building constructed for the specialized purpose of manufacturing coke and other by products," which are then used to manufacture steel. Balik explained the construction process for coke ovens and

coke oven batteries.  According to Balik, the newest Wilputte battery at Bethlehem Steel's Lackawanna plant—where decedent was employed—housed 76 coke ovens, was approximately 10 stories tall, and extended the length of three football fields.  The construction of the battery consisted of six phases over approximately 18 months, during which workers drove approximately 1,100 to 1,200 piles into the ground to support the battery's foundation, laid 10,000 pallets of bricks and 2,800 linear feet of running rail, and installed 250,000 feet of electric wiring and 20 electrical panels.

Balik explained that the 76 individual coke ovens—which could each hold between 28 and 34 tons of coal at one time—were "designed to work as an integrated battery, together with [various] supporting facilities, each of which also had to be designed, constructed, and integrated with the coke ovens to collectively comprise an operable coke oven battery."  To that end, Balik opined that coke ovens

> "are not pieces of equipment, but are chambers that have common walls with the battery and with the other ovens.  The ovens' brickwork is an integral structural component of the battery . . . . [E]ach oven has a common wall with the next oven except those at the end.  These walls support the battery roof."

Thus, according to Balik, a coke oven battery is not "a series of multiple, independent, free-standing ovens merely situated together in close proximity."  Rather, it "is a complex, integrated manufacturing plant, consisting of a massive building with numerous rooms; chambers; an elevator; tracks for the movement of coke, heating, plumbing and electrical utilities; and piping and other facilities for the movement of gas and other products."

Honeywell also proffered the affidavit of William Thomas Birmingham, which is similarly disregarded by the majority.  Birmingham—an engineer formerly employed by

Bethlehem as the superintendent of the Coke Oven Department at Lackawanna, whose "duties included planning and supervising engineering projects for the Coke Oven Department"—stated that "Wilputte provided only architectural and general contracting services for the construction of [several of Lackawanna's] coke plants." For each of these projects, "Wilputte would have received from Bethlehem a scope of work which outlined the number of ovens to be built and the expected output of the battery." Wilputte would then submit design plans to Bethlehem's engineers, "who either approved or rejected the plans in whole." Birmingham averred that Bethlehem's engineers "provided input on the design plans, mainly to ensure that [they] were consistent with the production objectives of the [plant]." Furthermore, once Bethlehem approved Wilputte's plans, "Wilputte would construct the project as general contractor," and would hire subcontractors to complete the required work. Because of their size and weight, coke oven batteries were constructed on site and were not movable. A publication provided by Birmingham cataloged the dimensions of the individual coke ovens at various steel mills around the country and indicated that the coke ovens built by Wilputte at Lackawanna measured approximately 18 inches wide by 40 feet long, by 12 feet high.

After plaintiff argued in response that the individual coke ovens were designed based upon technology developed by Wilputte—including the dimensions of the coke ovens and the manner in which they were filled with coal and heated—Honeywell submitted a second affidavit from Balik, which is again overlooked by the majority. This affidavit clarified that coke ovens "are not stand alone units and cannot function on their own," and that they were "not constructed separately, ahead of time, or off-site and were

not 'installed' within a larger structure or building, nor can they be removed, relocated or replaced." According to Balik, "a 'coke oven' is a brick chamber where coke can be placed, with two doors, a lid, and associated piping" and "is incapable of performing any function until the chamber is integrated into the surrounding coke oven battery." Moreover, "coke oven batteries are not mass produced, but each is uniquely designed for a very specific set of industrial customers who operate large manufacturing facilities such as steel making plants."

Supreme Court denied Honeywell's motion for summary judgment. On appeal, the Appellate Division reversed and granted Honeywell's motion, dismissing the complaint as against it (150 AD3d 1617 [4th Dept 2017]). The majority now reverses, holding that coke ovens are products and that "the imposition of a duty to warn in this case is a reasonable allocation of risks, burdens and costs among the parties and within society" (majority op at 17 [internal quotation marks and citation omitted]). In my view, a complete analysis of the policy considerations that have traditionally guided this state's products liability jurisprudence demonstrates that a coke oven is not a product for purposes of products liability.

"It is well settled that a manufacturer of defective products who places them into the stream of commerce may be held strictly liable for injuries caused by its products, regardless of privity, foreseeability or due care" (Finerty v Abex Corp., 27 NY3d 236, 241 [2016]; see Hoover v New Holland N. Am., Inc., 23 NY3d 41, 53 [2014]; Sukljian v Ross & Son Co., 69 NY2d 89, 94 [1986]). As relevant here, "[a] plaintiff may assert that [a] product is defective because . . . the manufacturer failed to provide adequate warnings

regarding the use of the product" (<u>Voss v Black & Decker Mfg. Co.</u>, 59 NY2d 102, 106-107 [1983] [citations omitted]; <u>see</u> <u>Matter of New York City Asbestos Litig.</u>, 27 NY3d 765, 787 [2016]).  Where the manufacturer has a duty to warn, it must warn against latent dangers resulting from foreseeable uses of the product and dangers arising from the product's intended use or a reasonably foreseeable unintended use (<u>see</u> <u>Matter of New York City Asbestos Litig.</u>, 27 NY3d at 788).

I agree with the majority that the question presented on this appeal is whether a coke oven is a "product" in the first instance for purposes of products liability.  If the coke ovens built by Wilputte at Lackawanna are not products, Wilputte owed no duty to warn of the hazards associated with their use and, consequently, plaintiff's causes of action sounding in products liability (both strict products liability and negligence) must be dismissed.  I also agree with the majority that there is no rigid definition that determines whether something is a "product."  Instead, whether Wilputte owed decedent a duty to warn should hinge upon the well-established principles of public policy that have consistently guided the products liability jurisprudence of this state for nearly a half-century.  Applying these tenets, I would hold that both the physical characteristics of Wilputte's coke ovens and an analysis of the reasonable allocation of the risks associated with their use among all the parties and within society, more generally, requires the conclusion that those ovens are not products.

This Court has long explained that whether a particular defendant should be subject to claims sounding in products liability "rests largely on public policy" (<u>Sage v Fairchild-Swearingen Corp.</u>, 70 NY2d 579, 585 [1987]; <u>see</u> <u>Gebo v Black Clawson Co.</u>, 92 NY2d

387, 392 [1998]).  Before we recognized such claims in Codling v Paglia (32 NY2d 330 [1973]), litigants would assert contract causes of action based in breach of warranty principles.  However, this theory became "inadequate in an economic universe that was dominated by mass-produced products and an impersonal marketplace" because breach of warranty claims required privity between the manufacturer and injured party (Denny v Ford Motor Co., 87 NY2d 248, 255 [1995]).  Thus, in Codling, we concluded that the absence of privity should not protect product manufactures from liability (see 32 NY2d at 342).  In that case, we stated that, "[h]aving invited and solicited the use, the manufacturer should not be permitted to avoid responsibility, when the expected use leads to injury and loss, by claiming that he made no contract directly with the user" (id. at 339).  We observed that, given the increasing sophistication of many contemporary products, "it is often only the manufacturer who can fairly be said to know and to understand when an article is suitably designed and safely made for its intended purpose" (id. at 340).  Likewise, "[o]nce floated on the market, many articles in a very real practical sense defy detection of defect, except possibly in the hands of an expert after laborious and perhaps even destructive disassembly" (id.).  We were "persuaded that from the standpoint of justice as regards the operating aspect of today's products," liability should generally be placed on the manufacturer (id. at 341).

Economic considerations also supported this rule.  Given the mass production, mass advertisement and mass distribution of products, we concluded in Codling that manufacturers should be held responsible for the injures caused by their products regardless of privity with the end user because those manufacturers were best positioned

to bear that expense by passing it onto their customers (see id.).  Moreover, we explained that such a rule incentivizes manufacturers, as the parties with the best "practical opportunity" to improve their products and to ensure those products are safe, and that "considerations of competitive disadvantage [would] delay or dilute automatic transferral of such added costs" to consumers (id.).

Subsequent decisions of this Court have consistently reaffirmed that the sophistication of modern products, their mass production, mass distribution and mass marketing, as well as the economic incentives associated with holding the manufacturer liable, must guide the courts in determining whether or not a cause of action for products liability is cognizable (see Matter of New York City Asbestos Litig., 27 NY3d at 790-791; Finerty, 27 NY3d at 241; Sprung v MTR Ravensburg, 99 NY2d 468, 472-473 [2003]; Sukljian, 69 NY2d at 95; Rosado v Proctor & Schwartz, 66 NY2d 21, 26 [1985]).  We have further emphasized that, generally, a seller, "by marketing [a] product, has undertaken a special responsibility toward members of the consuming public who may be injured by it," and that "[t]he public has the right to expect that sellers will stand behind their goods" (Sage, 70 NY2d at 585; see Sprung, 99 NY2d at 473; see also Restatement [Second] of Torts § 402A, Comment c).  Most recently, in the context of determining whether a manufacturer has a duty to warn against the danger inherent in using its product together with a product designed and produced by another company, we observed that "the court must settle upon the most reasonable allocation of risks, burdens and costs among the parties and within society," while also "accounting for the economic impact of a duty, pertinent scientific information, the relationship between the parties, the identity of the

person or entity best positioned to avoid the harm in question, the public policy served by the presence or absence of a duty and the logical basis of a duty" (Matter of New York City Asbestos Litig., 27 NY3d at 788).

I disagree with the majority that, on this record, public policy requires that a coke oven be deemed a product as a matter of law, such that Honeywell may be subject to causes of action sounding in products liability. Initially, the physical characteristics of coke ovens strongly militate in favor of my conclusion that they are not products. Coke ovens are unlike any item this Court has previously considered in this milieu.[1] Coke ovens are not mass produced, mass marketed, or mass distributed. Although Wilputte promoted its coke ovens, its only customers were large steel companies. Even as one of the largest coke oven builders servicing that "market," Wilputte constructed only 22 coke oven batteries in the United States between 1932 and 1962. While it is true that there may be dozens of coke ovens in a single battery, the uncontested proof submitted in support of defendant's motion for summary judgment makes plain that coke ovens cannot reasonably be viewed as separate and distinct from the larger coke oven battery. The coke ovens at the Lackawanna plant were both inseparable from the coke oven battery and inoperable outside of that battery. The coke ovens were effectively empty chambers without the coke oven battery to heat them. Under the majority's analysis, it is wholly unclear why, if a coke oven is a

---

[1] The closest analogy the majority presents is to large turbines. This Court, however, has never held that large turbines are products and the answer to that question would, inevitably, depend upon the evidence tendered by the parties, including with regard to how those objects are constructed, sold, marketed, and distributed.

product, the battery is not also a product, since it too, according to plaintiff's allegations and this record, is responsible for the emission of toxic gases.[2]

Not only is the object in question unlike any product we have encountered previously in the context of products liability, the relationship between Bethlehem and Wilputte is also distinguishable from those we have considered to date. In contrast with the typical consumer of mass-produced products, Bethlehem—as a large steel manufacturer that employed engineers specializing in coke oven battery operations—was uniquely situated to understand the hazards associated with coke production. Bethlehem's engineers dictated to Wilputte the number of ovens and total production required for its Lackawanna plant, provided input on the design plans, and approved or rejected the design and construction plans submitted by Wilputte. We are not presented with a situation in which the "functional validity and usefulness" of the item in question was "beyond the ken of the . . . consumer" (Codling, 32 NY2d at 340). Nor did Wilputte undertake a special responsibility by collaborating with Bethlehem in the construction of coke ovens. The practical reality is that both Wilputte and Bethlehem were sophisticated entities, with extensive knowledge about the use and construction of these structures (see Matter of New

---

[2] The majority's only response is to cite a 1954 brochure issued by Wilputte, proffered by plaintiff in opposition to Honeywell's motion. The majority posits that this document—which, identifies Wilputte as a "Designer[] and Builder[] of Complete Plants for the Carbonization of Coal and the Recovery of Coal Chemicals"—"makes no mention of the batter[ies] that defendant and [I] now claim are inseparable from 'operable coke ovens'" (majority op at 13 n 4). Of course, the silence of the brochure in this regard cannot reasonably be understood to refute Honeywell's expert affidavits, which provide uncontroverted descriptions of the construction and physical features of Wilputte's Lackawanna coke ovens.

York City Asbestos Litig., 27 NY3d at 790 ["we must consider whether the manufacturer is in a superior position to know of and warn against . . . hazards, for in all failure-to-warn cases, this is a major determinant of the existence of the duty to warn"]).  In addition, under the particular circumstances of this case, the economic policies underlying products liability are better advanced by placing the duty to warn on Bethlehem, rather than on Wilputte.  Bethlehem was in a superior position to control the use of the ovens by its employees, as well as to absorb the risk of loss by procuring insurance to cover any resulting injuries.  Further, Bethlehem had an equal, if not greater, incentive to minimize liability and danger to its employees.

I disagree with the majority's conclusion that our decision in Sprung v MTR Ravensburg suggests otherwise.  In that case, we held that a manufacturer of specialized sheet metal products was not a casual manufacturer and, thus, could be held strictly liable for injuries caused by a customized retractable floor that malfunctioned and injured the purchaser's employee (see 99 NY2d at 471; see Sukljian v Ross & Son Co., 69 NY2d at 95-96 [a casual manufacturer is not subject to strict products liability]).[3]  The purchaser in Sprung was a turbine manufacturer, and we observed that, "when a custom fabricator builds a product to suit a customer's specific needs, there may well be less informational disparity between the producer and the user than in the mass production setting" (99 NY2d at 474).  We ultimately concluded that the fabricator was liable because it had the greatest "opportunity and incentive to ensure safety in the process of making" its custom products

---

[3] Notably, in Sprung, the parties did not raise the question as to whether the items provided by the manufacturer to its customers were products for the purposes of products liability.

(id.). However, this was true largely because the purchaser was a turbine manufacturer, not an expert in custom fabricated flooring. Thus, while the product was designed specifically for the purchaser's facility, the purchaser was not better positioned than the fabricator to discover defects in the floor or safeguard against injury. In contrast, here, Bethlehem specialized in steel production, participated in the design of the coke ovens, and employed engineers who oversaw their construction and were experts in their operation. Under these circumstances, there is no basis for concluding that Wilputte, as the purported manufacturer, was the entity "who alone ha[d] the practical opportunity" to safeguard Bethlehem's employees against emissions produced by operation of the coke oven batteries (Codling, 32 NY2d at 341).

Curiously, the majority cites approvingly the definition of "product" set forth in the Third Restatement of Torts. In pertinent part, the Restatement states that products include "tangible personal property distributed commercially for use or consumption," and that "[o]ther items, such as real property and electricity, are products when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules stated in this Restatement" (Restatement [Third] of Torts: Products Liability § 19 [a]). However, the Third Restatement acknowledges that structures or improvements on real property, such as residential homes, usually "do[] not fit the pattern of a . . . manufactured product[]," in part, because a builder is generally not "perceived to be more capable than are purchasers of controlling or insuring against risks" (id. § 19, Comment e). Although the Restatement highlights certain exceptions to this rule, including prefabricated buildings or individual appliances installed

in a home, the evidence in this record demonstrates that a coke oven is more akin to a room in a house than to a prefabricated home or an appliance found therein.

I recognize that, without a viable products liability claim, plaintiff's available legal remedies may be limited.  Nevertheless, the policies underlying products liability do not support the conclusion reached by the majority, and we must resist the urge to "engage in a simple weighing of equities" when determining whether product liability principle's apply, "for a legal duty does not arise when[ever] symmetry and sympathy would so seem to be best served" (Matter of New York City Asbestos Litig., 27 NY3d at 787-788 [internal quotation marks and citations omitted]).   "A line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit" (De Angelis v Lutheran Med. Ctr., 58 NY2d 1053, 1055 [1983]).  The majority denies that its analysis is intended to drastically expand products liability.  Although I agree that the majority opinion should be construed as narrowly as possible and as applying only to the unique facts of this case, I nevertheless fear the potential of today's decision to have a broader impact, leading to future claims that the builders of single-use facilities or structures are all manufacturers of products, a result that would unreasonably expose builders of such structures to previously uncontemplated liability and that would be completely divorced from the public policy considerations underlying our products liability jurisprudence.

In sum, the record in this case demonstrates both that the construction of the coke ovens at issue did not implicate the concerns raised by mass production, mass distribution, or mass marketing, and that Bethlehem was better positioned than Wilputte to protect

decedent from the dangers associated with its factory. Therefore, I would hold that the coke ovens at issue are not products and that Wilputte did not owe decedent a duty to warn him of the dangers inherent in their use.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order reversed, with costs, and motion of defendant Honeywell International, Inc., successor in interest to the Wilputte Coke Oven Division of Allied Chemical Corporation, for summary judgment dismissing the complaint against it denied. Opinion by Judge Feinman. Judges Rivera, Fahey and Wilson concur. Judge Stein dissents and votes to affirm in an opinion in which Chief Judge DiFiore concurs. Judge Garcia took no part.

Decided June 11, 2019